UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

OSHAUNDA MCKINNEY                                                        PLAINTIFF

V.                                          CIVIL ACTION NO. 3:24-CV-489-DPJ-ASH

THE MISSISSIPPI SCHOOL FOR MATHEMATICS AND
SCIENCE, ET AL.                                                         DEFENDANTS

ORDER

Plaintiff Oshaunda McKinney worked as an administrative assistant at the Mississippi School for Mathematics and Science (MSMS).  After she was fired, she sued MSMS and several employees, claiming she encountered unlawful race discrimination and retaliation.  Defendants moved for summary judgment [75] under Federal Rule of Civil Procedure 56.  For the reasons explained below, the Court finds Defendants' motion for summary judgment [75] should be granted as to (1) the abandoned age-discrimination claim; (2) the unexhausted Title VII retaliation claim; (3) the Fourteenth Amendment retaliation claim; (4) the First Amendment retaliation claim; and (5) the Title VII punitive-damages claim.  The motion is otherwise denied.

I.      Facts and Procedural History

McKinney joined MSMS in November 2021 as an administrative assistant, serving in a temporary position while Defendant Amy Elsmore was on leave.  Am. Compl. [12] at 4.  This lawsuit centers on McKinney's belief that when Elsmore returned to work, she exhibited "hostility" toward her that was "motivated by race."  *Id.* at 5.  McKinney expressed these concerns to Elsmore at an informal meeting at a Starbucks in April 2022; McKinney's supervisor, Danette Clear Moore, was also present.  *Id.*

Elsmore was later promoted, *id.*, and "transferred to another building, which alleviated [McKinney's and Elsmore's] daily interaction," Pl.'s Mem. [83] at 4.  Moore and then-interim

executive director Rick Smith offered McKinney a permanent position in May 2022.  Am. Compl. [12] at 5.

A month later, MSMS hired Defendant Donald Cook to serve as executive director.  Pl.'s Mem. [83] at 4.  According to McKinney, Elsmore worked with Cook, told him that McKinney had accused her of race discrimination, and spoke unfavorably about McKinney, telling him McKinney "had 'disrespectful body language[,]' . . . 'raised her voice,' 'yelled her name,' and had 'resting bitch face.'"  Am. Compl. [12] at 6.

On July 18, 2022, Cook met with Moore and Elsmore to discuss McKinney.  Moore secretly recorded the meeting.  Recording [74]; *see* Pl.'s Mem. [83] at 11 (describing recording as "secret").  Two issues arose in that conversation—McKinney's interactions with coworkers, specifically Elsmore, and McKinney's internet usage.

Cook started the meeting by addressing McKinney and Elsmore's relationship.  Cook stated, "[McKinney] is mean to Amy [Elsmore], and Amy is one of the nicest people I have ever met in my life.  And I don't understand why anybody would be mean to her, but Amy doesn't want to go over there at all because she has to recoup from that experience."  Recording [74] at 1:38–59.

Elsmore then elaborated for about 15 minutes, explaining that McKinney's body language, facial expressions, and mannerisms were disrespectful; she created a depressive environment; she does not like Elsmore; her tone is horrible; she's defensive and doesn't solicit Elsmore's advice or input; she gets upset and raises her voice, she brought up race at the informal meeting in April; and she makes Elsmore feel attacked.  *Id.* at 2:00–16:00 (with periodic comments by Moore).  Moore suggested that she and Cook work out a plan to address Elsmore's concerns, but Cook responded that he wanted McKinney fired.  *Id.* at 17:15.  He added, "I'm not

having a cancer in this organization that I love. . . . You will not give her a reason, just tell her her services are no longer needed." *Id.* at 17:28.

Another issue came up during this conversation—McKinney's internet usage. *Id.* at 16:04–32. Early in McKinney's employment, then-IT coordinator Matthew Fondren observed McKinney watching a streaming service at her desk. Pl.'s Mem. [83] at 2–3. Then-interim executive director Smith counseled McKinney, saying "she needed to be working while school was in session rather than devoting her full attention to a TV show." *Id.* at 3. According to McKinney, "employees were permitted to stream music or other background noise at their desks," Am. Compl. [12] at 9, so she did not "understand him to mean . . . that *background* streaming of music, for example, was prohibited," Pl.'s Mem. [83] at 3.

During the July 18 meeting, Cook expressed concerns about McKinney visiting streaming sites during the workday, Recording [74] at 16:04–32, and Moore suggested she could be streaming music, *id.* at 17:00. Cook later testified that "[t]he decision [to terminate McKinney] became clear to me when I saw that computer usage and the extreme amount of streaming that was not explainable by background ambiance music." Cook Dep. [75-7] at 57 (deposition pagination). McKinney claims MSMS's insistence that she improperly used her computer is pretext for race discrimination and retaliation. Am. Compl. [12] at 9.

After filing a charge of discrimination with the Equal Employment Opportunity Commission (EEOC), McKinney filed this civil action, alleging seven causes of action. She later abandoned her age-discrimination claim, Pl.'s Mem. [83] at 25 n.13, leaving six counts: (1) equal protection under the Fourteenth Amendment (citing 42 U.S.C. § 1983); (2) race discrimination under 42 U.S.C. § 1981; (3) retaliation under the First and Fourteenth Amendments; (4) retaliation under § 1981; (5) race discrimination under Title VII; and (6)

3

retaliation under Title VII, Am. Compl. [12] at 9–12.  The Title VII claims are against MSMS.

*Id.* at 12.  The remaining claims are against the current executive director of MSMS (Ginger

Tedder) in her official capacity; Dr. Donald Cook, in his individual capacity; and Amy Elsmore,

in her individual capacity.  *Id.* at 2.

II.    Rule 56 Standard

Summary judgment is warranted under Federal Rule of Civil Procedure 56(a) when

evidence reveals no genuine dispute over any material fact and that the moving party is entitled

to judgment as a matter of law.  The rule "mandates the entry of summary judgment, after

adequate time for discovery and upon motion, against a party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case[] and on which

that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

(1986).

The party moving for summary judgment "bears the initial responsibility of informing the

district court of the basis for its motion[] and identifying those portions of [the record] which it

believes demonstrate the absence of a genuine issue of material fact."  *Catrett*, 477 U.S. at 323.

The nonmoving party must then "go beyond the pleadings" and "designate 'specific facts

showing that there is a genuine issue for trial.'"  *Id.* at 324 (citation omitted).  In reviewing the

evidence, factual controversies are to be resolved in favor of the nonmovant, "but only when . . .

both parties have submitted evidence of contradictory facts."  *Little v. Liquid Air Corp.*, 37 F.3d

1069, 1075 (5th Cir. 1994) (en banc).  When such contradictory facts exist, the court may "not

make credibility determinations or weigh the evidence."  *Reeves v. Sanderson Plumbing Prods.,*

*Inc.*, 530 U.S. 133, 150 (2000).  It must "interpret all facts and draw all reasonable inferences in

favor of the nonmovant."  *EEOC v. Rite Way Serv.*, 819 F.3d 235, 239 (5th Cir. 2016); *accord*

*Tolan v. Cotton*, 572 U.S. 650, 660 (2014).  But conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments have never constituted an adequate substitute for specific facts showing a genuine issue for trial.  *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002) (citing *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993)); *accord Little*, 37 F.3d at 1075.

III.    Race Discrimination

The Court begins by looking at McKinney's race-discrimination claims under Title VII (Count 5), § 1981 (Count 2); and the Fourteenth Amendment (Count 1).  The analysis overlaps.  Circumstantial race-discrimination claims under Title VII, § 1981, and § 1983 follow the *McDonnell-Douglas* burden-shifting framework.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see Lauderdale v. Tex. Dep't of Crim. Just., Institutional Div.*, 512 F.3d 157, 166 (5th Cir. 2007) ("[T]he inquiry into intentional discrimination is essentially the same for individual actions brought under sections 1981 and 1983, and Title VII." (quotation marks omitted)).

First, McKinney must establish a prima facie case, and Defendants assume that she can.  Defs.' Mem. [76] at 19.  Next, Defendants present a legitimate, nondiscriminatory reason for their decision—they terminated McKinney "for watching streaming sites while she was supposed to be working, in addition to her problems with co-workers and complaints received about her."  *Id.* at 20.

Finally, McKinney "must raise a fact issue that proves the proffered reason is pretextual."  *Shater v. Shell Oil Co.*, No. 22-20289, 2022 WL 17250190, at *1 (5th Cir. Nov. 28, 2022).  Generally, the plaintiff must "offer sufficient evidence to create a genuine issue of material fact either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for

its conduct, and another 'motivating factor' is the plaintiff's protected characteristic (mixed-motives alternative)." *Rachid v. Jack In the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004) (cleaned up); *see Vaughn v. Woodforest Bank*, 665 F.3d 632, 636 (5th Cir. 2011) (same).

McKinney appears to utilize both approaches. *See* Pl.'s Mem. [83] at 10 n.6 (referencing "motiving factor"); *id.* at 10 ("Where multiple reasons are at issue, it is enough if there is a basis for thinking that race was <u>one</u> of the 'but-for' causes." (citing *Bostock v. Clayton Cnty.*, 590 U.S. 644, 656 (2020)); *id.* at 15 ("The claims about the streaming also reveal pretext.").

A.      McKinney's Pretext Evidence

McKinney makes six pretext arguments:  (1) MSMS omitted the main reason for her termination from its EEOC position statement; (2) Cook and another individual failed to conduct adequate investigations; (3) MSMS's reliance on her streaming is unworthy of credence; (4) MSMS destroyed evidence relevant to the streaming allegation; (5) MSMS's claims of her poor performance are pretextual; and (6) racially problematic statements by Defendants suggest racial animus.  Pl.'s Mem. [83] at 11–20.  While the Court has considered all arguments, it will not discuss all six because at least two create a question of fact on pretext.

***Inconsistent Rationale.***  McKinney believes MSMS told the EEOC that she was fired for internet usage because it knew the real reason—"Elsmore's animosity (and Cook's animosity on her behalf) is tainted by racial bias."  Pl.'s Mem. [83] at 11.  She argues that the shifting rationales show pretext.  The Fifth Circuit has "long held that a defendant's shifting, inconsistent reasons for objectionable conduct can provide sufficient evidence of pretext."  *Hager v. Brinker Tex., Inc.*, 102 F.4th 692, 704 (5th Cir. 2024) (citing *Gee v. Principi*, 289 F.3d 342, 347–48 (5th Cir. 2002)).

In its EEOC position statement, MSMS states that McKinney was fired for "improper use of her work computer during business hours" after "ignor[ing] . . . directives to stop."  EEOC Position Statement [72-8] at 6; *see also id.* ("MSMS exercised its discretion to terminate [McKinney] based on a legitimate non-discriminatory reason (insubordination, improper use of work equipment, and abuse of state time.)").  The statement did not mention the conflict with Elsmore or anyone else.  Then, during its Rule 30(b)(6) deposition, MSMS's representative was asked whether he was "aware of any other reason that she was terminated" other than the internet usage.  MSMS Dep. [75-1] at 47.  The witness responded, "I am not."  *Id.*; *see also id.* at 48, 121. But in their motion for summary judgment, Defendants point to McKinney's streaming *and* "her problems with co-workers and complaints received about her."  Defs.' Mem. [76] at 20.

This newly mentioned basis appears to have been front and center when Cook decided to fire McKinney.  In Moore's recording of her July 2022 meeting with Cook and Elsmore, Cook begins the discussion saying, "[McKinney] is mean to Amy [Elsmore], and Amy is one of the nicest people I have ever met in my life."  Recording [74] at 1:38–59.  Elsmore then speaks for about fifteen minutes explaining how badly McKinney makes her feel.  *Id.* at 2:00–16:00.  When she finishes, Cook does discuss the internet-usage issue for about a minute before saying, "I want her fired, and I want you [(Moore)] to do it. . . .  I'm not having a cancer in this organization." *Id.* at 17:05–13.  Cook then told Moore to fire McKinney immediately.  *Id.* at 17:59.  Cook does raise the streaming issue again, *see id.* at 18:00, and says to Moore, "You've allowed all that stuff to happen," *id.* at 19:39.

So what really motivated Cook?  A strong clue may be his "cancer" reference, uttered as he instructed Moore to fire McKinney.  *Id.* at 17:05–13.  When asked about the meeting during his deposition, Cook testified that he "had come to the conclusion that there were issues.  The

7

cancer that I referred to, *but that* [(the computer-usage data)] pretty much locked up the decision." Cook Dep. [75-7] at 77 (emphasis added). A reasonable jury could find that the "cancer"—McKinney's interactions with Elsmore and perhaps others—was the real reason for the decision, though MSMS excluded it from the EEOC position statement and its 30(b)(6) deposition. That creates a pretext inference. *See Gee*, 289 F.3d at 347–48 (recognizing that "disingenuous and inconsistent" explanation for discriminatory conduct casts doubt on proffered reason, which can defeat summary judgment because "a factfinder may infer the ultimate fact of retaliation from the falsity of the explanation").[1]

Defendants offer two primary responses. First, they note that some Fifth Circuit cases have found no pretext inference because the two stated reasons did not conflict and were instead independent rationales for the decision. Defs.' Reply [90] at 10 (citing *Nasti v. CIBA Specialty Chems. Corp.*, 492 F.3d 589, 594 (5th Cir. 2007)). But *Nasti* is distinguishable because the employer "ha[d] consistently stated that while it planned to terminate Nasti for performance related reasons, its ultimate decision to terminate her was based on the alleged falsification of the expense and call reports." 492 F.3d at 594. MSMS cited only the computer-usage concerns until their summary-judgment motion, and a reasonable jury could conclude from the July 2022 recording that the issues with Elsmore were the real reason for the decision.

Second, Defendants cite *Bennett v. Consolidated Gravity Drainage District No. 1*, which observed that "in those cases in which [the Fifth Circuit has] focused on inconsistent rationales,

---

[1] There is an inference that Defendants were unaware of Moore's recording when they staked out their original position before the EEOC and again under oath during the Rule 30(b)(6) deposition. *See* Pl.'s Mem. [83] at 11. According to McKinney, once the recording was disclosed, they had to acknowledge what she says was always the real reason. *Id.* If true, that would make the omission of this explanation more suspect, but McKinney has not cited record evidence showing the timing of the disclosure.

there has been otherwise strong evidence of pretext."  648 F. App'x 425, 430 (5th Cir. 2016); *see*

Defs.' Reply [90] at 11 n.11.  *Bennett* is unpublished and therefore nonbinding, while the

published opinion in *Hager* stated that "a defendant's shifting, inconsistent reasons for

objectionable conduct can provide sufficient evidence of pretext."  102 F.4th at 704.

In any event, the differing reasons do not stand alone.  For starters, when Cook instructed

Moore to fire McKinney, he said, "You will not give her a reason, just tell her her services are no

longer needed."  Recording [74] at 17:28.  This too suggests that the reason given to the EEOC

and in the 30(b)(6) deposition was "disingenuous and inconsistent."  *Gee*, 289 F.3d at 347.  And

as discussed next, other evidence exists.

***Inadequate Investigation.***  "An employer's investigatory choices might, depending on

the facts of a particular case, be suspicious in a way that renders the defendant's explanation

unworthy of credence and permits an inference of discrimination."  *Owens v. Circassia Pharm.*

*Inc.*, 33 F. 4th 814, 828–29 (5th Cir. 2022) (cleaned up); *see also Laxton v. Gap Inc.*, 333 F.3d

572, 581 (5th Cir. 2003) (finding evidence sufficient to create jury issue when, among other

things, plaintiff's "supervisors never gave [the plaintiff] the chance to explain her conduct").

McKinney raises two perceived inadequate investigations.  First, she says Cook failed to

adequately investigate Elsmore's complaints or McKinney's internet usage.  Pl.'s Mem. [83] at

13–15.  Second, she claims Wendy Clemons, Associate State Superintendent at the Mississippi

Department of Education, failed to adequately investigate concerns Moore raised via email,

following McKinney's termination.  *Id.* at 15; *see* Moore Email [72-4] (dated July 19, 2022);

Clemons Resp. [90-2] (dated Jan. 19, 2023).  The Court focuses on Cook.[2]

---

[2] Moore wrote that Elsmore's complaints "reinforce the stereotype of an 'angry black woman'"
and stated that McKinney "was fired without significant cause or at least an opportunity to
answer the charges."  Moore Email [72-4] at 3.  Defendants point out that Clemons is not

McKinney faults Cook for not looking into Elsmore's complaints, not getting McKinney's side of the story, and not investigating Elsmore's report that McKinney had accused her of race discrimination. Cook admitted that Elsmore's complaints stemmed from the "transitioning," when McKinney took over Elsmore's job. Cook Dep. [75-7] at 37; *see id.* at 37–39 (explaining that Elsmore expressed difficulties with McKinney, specifically in the context of McKinney taking over Elsmore's former job).

During the recorded meeting, McKinney's supervisor (Moore) did not seem to think McKinney had done anything to warrant serious penalties. *See* Recording [74] at 18:40. But Cook's mind appeared to be set, and he admitted during his deposition that he did not seek any other input from Moore or McKinney about the breakdown between McKinney and Elsmore. Cook Dep. [75-7] at 71. He explained that McKinney and Moore offered "unreliable" perspectives. *Id.* at 72. But he also admitted that McKinney had never said or done "anything untrue . . . that made [him] think that she was untrustworthy as a source of information." *Id.*

On McKinney's accusations of race discrimination by Elsmore, Cook could not recall if he knew about them before the July 2022 meeting or if he learned about them for the first time in that meeting. *Id.* at 42. Either way, there is no indication this information prompted further scrutiny.

Again, a reasonable jury could find the Elsmore issues drove the termination decision. But if MSMS "were genuinely concerned about [McKinney's] asserted performance-related

---

employed by MSMS and say Moore's email is inadmissible hearsay. Defs.' Reply [90] at 2–3. Moreover, Clemons's response addresses issues unrelated to McKinney and focuses on Moore's "grievance submitted on November 8, 2022." Clemons Resp. [90-2] at 1. McKinney seems to suggest that Clemons investigated Moore's November grievance but did not investigate the concerns expressed in her July email. *See* Pl.'s Mem. [83] at 15. This argument is underdeveloped, and it is not apparent how Clemons's response (or lack thereof), after the termination suggests pretext.

problems, it would have permitted [her] the opportunity to explain or to improve her conduct, but it did not do so." *Laxton*, 333 F.3d at 581. That offers more pretext evidence. *Id.*

"Whether summary judgment is appropriate depends on numerous factors, including 'the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered.'" *Price v. Fed. Exp. Corp.*, 283 F.3d 715, 720 (5th Cir. 2002) (quoting *Reeves*, 530 U.S. at 148). McKinney's prima facie case is not disputed, and she has created a fact question whether Defendants' reason for her termination was pretext.

Viewing all this in the light most favorable to McKinney, the Court finds genuine fact issues exist about whether race was a motivating factor in Defendants' decision. Defendants' motion for summary judgment on the race-discrimination claims under Title VII, § 1981, and § 1983 (Fourteenth Amendment) is denied.[3]

IV.    Retaliation

Next, the Court turns to McKinney's retaliation claims under Title VII (Count 6), § 1981 (Count 4), and the First and Fourteenth Amendments (Count 3). In general, McKinney contends that Elsmore interacted with her in a way that was "racist and unjustified." Pl.'s Mem. [83] at 3. And after McKinney expressed these concerns to Elsmore and McKinney's supervisor (Moore), Elsmore persuaded Cook to terminate McKinney's employment. *See id.* at 4 (describing informal meeting at Starbucks); *id.* at 5 (describing how Elsmore influenced Cook). In other words, McKinney believes Elsmore and Cook retaliated against her for complaining about racist conduct.

---

[3] The Court will discuss Tedder, Elsmore, and Cook's liability below.

A.      Exhaustion under Title VII

First, MSMS contends that McKinney's Title VII retaliation claim should be dismissed

for failure to exhaust because she neglected to mention retaliation in her EEOC charge. "Before

seeking judicial relief, . . . Title VII plaintiffs are required to exhaust their administrative

remedies by filing a charge of discrimination with the [EEOC] within 180 days of the alleged

discrimination." *Davis v. Fort Bend Cnty.*, 893 F.3d 300, 303 (5th Cir. 2018) (citing 42 U.S.C.

§ 2000e-5(e)(1)).

"[A]n employee may not base a Title VII claim on an action that was not previously

asserted in a formal charge of discrimination to the EEOC, or that could not 'reasonably be

expected to grow out of the charge of discrimination.'" *Filer v. Donley*, 690 F.3d 643, 647 (5th

Cir. 2012) (quoting *Pacheco v. Mineta*, 448 F.3d 783, 789 (5th Cir. 2006)). That's because

exhaustion exists "'to facilitate the administrative agency's investigation and conciliatory

functions'"; it is "important because it provides an opportunity for voluntary compliance before a

civil action is instituted." *Davis*, 893 F.3d at 307 (quoting *Filer*, 690 F.3d at 647).

McKinney completed a "Charge of Discrimination," alleging discrimination based on

"Age, Race":

> I was hired by the above employer as a temp in November 2021 and became full-time as an Administrative Assistant on May 12, 2022. On July 18, 2022, I was told by my supervisor that Executive Director Dr. Donald Cook wants you gone. I believe I have been discriminated against because of my race (Black) in violation of Title VII of the Civil Rights Act of 1964, as amended, and because of my age (42) in violation of the Age Discrimination in Employment Act of 1967, as amended, because I was replaced by a younger White female.

EEOC Charge [75-4].

McKinney does not bring up retaliation, or retaliatory conduct, in her charge. *Id.*

Likewise, the EEOC intake interview notes do not mention retaliation, retaliatory conduct, or

complaints of discrimination by McKinney to her employer that could signal protected activity. Intake [82-4].  MSMS's position statement in response to the EEOC also confirms MSMS did not think McKinney had alleged retaliation.  EEOC Position Statement [72-8] at 4–6 (addressing claims of race and age discrimination).  And McKinney's rebuttal to that position statement does not mention retaliation.  *See* Pl.'s EEOC Rebuttal [79-5] at 4 ("[M]y dismissal was racially motivated."); *id.* at 7 ("[M]y race is what motivated this decision to terminate by employment[.]")

"[D]iscrimination and retaliation claims are distinct, and the allegation of one in an EEO charge does not exhaust a plaintiff's remedies as to the other."  *Bouvier v. Northrup Grumman Ship Sys., Inc.*, 350 F. App'x 917, 921 (5th Cir. 2009) (affirming dismissal of retaliation claim as unexhausted).  McKinney's EEOC charge did not put the EEOC or MSMS on notice that she advanced a retaliation claim.  And there is no sign that the resulting investigation included retaliation.  *See id.* ("While this court will read the EEO charge 'somewhat broadly' to determine 'what EEOC investigations it can reasonably be expected to trigger,' Bouvier's failure to reference retaliation in the EEO charge defeats her retaliation claim." (quoting *Pacheco*, 448 F.3d at 489)).  Thus, McKinney failed to exhaust.

*Waiver.*  Even if McKinney failed to exhaust her retaliation claim, she believes MSMS waived that defense.  "[T]he usual practice under the Federal Rules is to regard exhaustion as an affirmative defense."  *Jones v. Bock*, 549 U.S. 199, 212 (2007) (considering exhaustion under Prison Litigation Reform Act); *see Davis*, 893 F.3d at 307 ("Failure to exhaust is an affirmative defense that should be pleaded.").  McKinney claims, "Defendant not only failed to raise an exhaustion defense in the Answer, it affirmatively admitted that the claims brought in this case were administratively exhausted."  Pl.'s Mem. [83] at 32 (citing Answer [15] at 3.).

13

That's partially correct.  As she notes, Defendants' Answer states, "These Defendants admit that Plaintiff has exhausted all available administrative remedies as of September 24, 2024. These Defendants deny that Plaintiff received her Right to Sue letter before filing her Complaint in this action."  Answer [15] at 3 (under heading "Jurisdiction, Venue, Exhaustion and Jury Demand").  But McKinney skips Defendants' 24th Defense:  "To the extent that Plaintiff seeks to litigate issues outside the scope of her charge of discrimination, the Amended Complaint fails to state a claim upon which relief can be granted."  *Id.* at 24.

Whether Defendants pleaded exhaustion is a close question.  The Fifth Circuit has explained that affirmative defenses—like exhaustion— are

> subject to the same pleading requirements as is the complaint.  Even though the aim of the relaxed notice pleading standards of Federal Rule of Civil Procedure 8 is to prevent parties from being defaulted for committing technical errors, a defendant nevertheless must plead an affirmative defense with enough specificity or factual particularity to give the plaintiff "fair notice" of the defense that is being advanced.

*Woodfield v. Bowman*, 193 F.3d 354, 362 (5th Cir. 1999) (quoting *Automated Med. Lab'ys, Inc. v. Armour Pharm. Co.*, 629 F.2d 1118, 1122 (5th Cir. 1980)).  Defendants conceded exhaustion at one point but then asserted it in their 24th Defense.

The Court concludes that MSMS did not waive this defense.  A "waiver is the intentional relinquishment or abandonment of a known right."  *United States v. Olano*, 507 U.S. 725, 733 (1993) (quotation marks omitted).  "[T]he issue of waiver essentially turns on whether waiver was made knowingly and voluntarily."  *Farber v. Crestwood Midstream Ptrs. L.P.*, 863 F.3d 410, 417 (5th Cir. 2017) (quotation marks omitted).  Because the defense appears in the Answer, McKinney was on notice, and MSMS did not knowingly and voluntarily waive it.  *See also* Fed. R. Civ. P. 8(e) ("Pleadings must be construed as to do justice").

But even assuming the Answer failed to preserve the defense, under Rule 8(c), "we do not take a formalistic approach to determine whether an affirmative defense was waived. Rather, we look at the overall context of the litigation and have found no waiver where no evidence of prejudice exists and sufficient time to respond to the defense remains before trial." *Pasco ex rel. Pasco v. Knoblauch*, 566 F.3d 572, 577 (5th Cir. 2009). Thus, when "a defendant raises the issue at a pragmatically sufficient time, and if the plaintiff is not prejudiced in its ability to respond, there is no waiver of the defense.'" *Vanhoy v. United States*, 514 F.3d 447, 450 (5th Cir. 2008) (cleaned up).

Defendants argued exhaustion in their summary-judgment brief, which can be soon enough. *See Smith v. Travelers Cas. Ins. Co. of Am.*, 932 F.3d 302, 309 (5th Cir. 2019) (holding that summary-judgment stage was pragmatically sufficient time to raise waived affirmative defense). That depends, of course, on whether prejudice exists. *Id.* But McKinney did not attempt to identify any in her response. *See* Pl.'s Mem. [83] at 32. Nor did she invoke Rule 56(d). Indeed, it is hard to picture the discovery she would need since the failure to exhaust is often decided as a matter of law based on EEOC records like those here. *See Ernst v. Methodist Hosp. Sys.*, 1 F.4th 333, 339 (5th Cir. 2021); *see also Barr v. Stripes L.L.C.*, No. 21-20278, 2022 WL 1044695, at *6 (5th Cir. Apr. 7, 2022) ("We do not reach Barr's challenges to the district court's determination on the merits because failure to exhaust and failure to timely file independently justify resolving this case as a matter of law."). When questions of law like this are raised in a summary-judgment motion, the Fifth Circuit has found no prejudice, and therefore no waiver. *See Vanhoy*, 514 F.3d at 450; *accord Lee v. United States*, 765 F.3d 521, 523–24 (5th Cir. 2014).

In sum, the Court finds Defendants' 24th Defense put McKinney on notice that claims based on "issues outside the scope of the charge of discrimination" were subject to a motion to dismiss (or motion for summary judgment).  Answer [15] at 24.  Even if not, MSMS again raised the defense at a pragmatically sufficient time to avoid waiver.  McKinney's Title VII retaliation claim is dismissed. [4]

B.    Section 1981

Retaliation claims under § 1981 don't require exhaustion and are subject to the same burden-shifting framework under *McDonnell Douglas*.  *See* 411 U.S. at 802; *see also Owens v. Circassia Pharms., Inc.*, 33 F.4th 814, 835 (5th Cir. 2022).  To establish a prima facie case, McKinney must show "(1) she engaged in a protected activity; (2) she suffered an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse employment action."  *Saketkoo v. Adm'rs of Tulane Educ. Fund*, 31 F.4th 990, 1000 (5th Cir. 2022) (quotation marks omitted).  If she succeeds, Defendants have the burden to "provide a legitimate, non-discriminatory reason for the adverse employment decision."  *Id.* (quotation

---

[4] McKinney says "[t]he Fifth Circuit explicitly holds that such defenses cannot be raised in a motion for summary judgment filed after the Answer."  Pl.'s Mem. [79] at 32 (citing *Funding Sys. Leasing Corp. v. Pugh*, 530 F.2d 91, 95–96 (5th Cir. 1976)).  That overstates the cited authority, which is otherwise distinguishable.  In *Pugh*, the defendant "brief[ly]" mentioned an affirmative defense in a summary-judgment motion filed *after* the pretrial order was entered.  530 F.2d at 95.  The defendant then tried to argue the defense on appeal, but the Fifth Circuit held, "When the defendant has waived his affirmative defense by failing to allege it in his answer, *or have it included in a pre-trial order* of the district court that supersedes the pleadings, he cannot revive the defense in a memorandum in support of a motion for summary judgment."  *Id.* at 96 (emphasis added) (citing *Roe v. Sears, Roebuck & Co.*, 132 F.2d 829 (7th Cir. 1943)).  While the timing in *Pugh* caused obvious prejudice, that's not what happened here.  The summary-judgment motion was filed before the pretrial order.  Under similar circumstances, the Fifth Circuit has found no waiver.  *See, e.g.*, *Allied Chem. Corp. v. Mackay*, 695 F.2d 854, 856 (5th Cir. 1983) (citing *Bettes v. Stonewall Ins. Co.*, 480 F.2d 92, 94 (5th Cir. 1973)).

16

marks omitted).  If Defendants meet this burden, then McKinney "has the burden to prove that the proffered reason is pretextual." *Id.* (quotation marks omitted).

Defendants focus on the first and third elements of McKinney's prima facie case, arguing that she did not engage in protected activity and thus the protected activity didn't cause her termination.  Defs.' Mem. [76] at 24; Defs.' Reply [90] at 18.  In response, McKinney points to two instances of protected speech:  (1) the meeting at Starbucks with Moore (her supervisor) and Elsmore and (2) a conversation with Moore alone after the Starbucks meeting.  Pl.'s Mem. [83] at 21.

"An employee's informal complaint to an employer may constitute participation in a protected activity, provided that the complaint is in opposition to conduct that is unlawful, and the employee holds a good faith, reasonable belief of the conduct's unlawfulness." *Clark v. Chickasaw Cnty.*, No. 1:09-CV-192-SA-JAD, 2010 WL 3724301, at *3 (N.D. Miss. Sept. 16, 2010); *see Cargill v. Miss. Valley Title Ins. Co.*, No. 3:13-CV-112 DPJ-FKB, 2013 WL 1561119, at *1 (S.D. Miss. Apr. 12, 2013).

First, McKinney points to Elsmore's deposition testimony describing the meeting at Starbucks.  Pl.'s Mem. [83] at 21; *see also id.* at 4.  McKinney suggests that Elsmore was the first to mention race.  *See* Pl.'s Dep. [75-2] at 128; *see also* Pl.'s Mem. [83] at 4.  But Elsmore indicates McKinney brought race into the conversation. *See* Elsmore Dep. [82-2] at 79–80.  Elsmore's testimony can be a bit hard to follow but does confirm that race was discussed at the meeting.

> Because she [(McKinney)]—so, I'm trying—like I said, she kind of jumped
> around.  And I was trying to understand what she was trying to convey to me.  But
> then, she said—and that's when I said that I was from Arizona.

17

> And she said—she did say something about maybe the color of her skin.  And I—
> and I said—I didn't say I don't care.  I would never say that.  I said, "I don't—that
> doesn't, like—I don't care what color your skin is like.

*Id.* at 79–80.

> Because she [(McKinney)] was going—when I kept saying she was going on and
> on and on about people here, and her being discriminated—or being discriminated
> against.
> . . .
>
> But she kept—she was—she kept accusing me of things and accusing me of
> things and accusing—and that's why I was—and nothing—like, Dr. Moore didn't
> do anything to, like, make her explain what she was—what—like, when she said
> I'm a little—like, I lied about her.

*Id.* at 132, 133–34.  And Cook testified that Elsmore conveyed to him that McKinney raised the

issue of race at the informal meeting and it bothered Elsmore.

> Q.    What did you understand [Elsmore] to be meaning when she said that Ms.
> McKinney tried to bring up race?
>
> A.    That Ms. McKinney accused her of race being a factor in whatever issue
> they were discussing.
>
> Q.    And what did you understand Amy's response to that accusation to be?
>
> A.    That she was not considering race.
>
> Q.    And was Amy upset about being accused?
>
> A.    I think it bothered her.

Cook Dep. [75-7] at 41–42.

Second, McKinney points to her own deposition testimony attesting that she complained

to Moore about racism.  Pl.'s Mem. [83] at 24.

> Q.    Did you ever complain to Dr. Moore about racism?
>
> A.    Yes.
>
> Q.    What about?

A.    I mean, she was there for the majority of that conversation at Starbucks, so a lot of stuff I didn't have to explain.  She witnessed it.  As far as [Elsmore] crying, you know, this was not—there was no reason for her to cry other than to gain sympathy.

McKinney Dep. [75-2] at 132; *see also id.* at 133–34.

Admittedly, the witnesses' testimony is murky in the ways Defendants note.  And not all conversations that touch on race amount to protected activity.  But at the summary-judgment stage, the Court views the evidence in the light most favorable to McKinney; she has created a question of fact whether she engaged in protected activity.

As for the third prong, establishing a causal link, "[a] plaintiff does not have to prove that [her] protected activity was the sole factor motivating the employer's challenged actions in order to establish the causal link element of a prima facie case."  *Clark*, 2010 WL 37324301, at *4 (citing *Gee*, 289 F.3d at 345).  McKinney first asserts that the temporal proximity of the termination establishes this final element of the prima facie case.  Pl.'s Mem. [83] at 24.  She also states that a causal connection exists because "Elsemore explicitly invoked the protected activity," i.e., the Starbucks conversation, "in explaining the reasons that she and Cook felt that McKinney was a 'cancer.'"  *Id.*

Defendants don't push back much in their reply about the prima facie stage, acknowledging that temporal proximity can "in some instances establish a *prima facie* case of retaliation."  Defs.' Reply [90] at 20.  They instead pivot and argue that McKinney has failed to show "but for" causation at the pretext stage.  *Id.* at 20.  But that's not the argument Defendants asserted in their opening brief.  There, they said, "McKinney's claim fails as to the first and third elements [of her prima facie case] because she did not engage in protected activity, so there can be no causal connection."  Defs.' Mem. [76] at 24.  Because new arguments give the opposing party no opportunity to respond, "[i]t is the practice of [the Fifth Circuit] and the district courts to

19

refuse to consider arguments raised for the first time in reply briefs." *Gillaspy v. Dall. Indep. Sch. Dist.*, 278 F. App'x 307, 315 (5th Cir. 2008) (citing *Peteet v. Dow Chem. Co.,* 868 F.2d 1428, 1437 (5th Cir. 1989)).

And because Defendants' initial causation argument was that no protected activity occurred, *see* Defs.' Mem. [76] at 24, the same evidence that supports a question of fact on protected activity creates one for the causal link.  Defendants' motion for summary judgment on Plaintiff's § 1981 retaliation claim is denied.

> C.      First and Fourteenth Amendments

Lastly, the Court looks at McKinney's retaliation claims under the First and Fourteenth Amendments (Count 3).

***Fourteenth Amendment.***  Defendants correctly point out that "the Equal Protection Clause does not preclude workplace retaliation." *Jackson v. Mississippi*, No. 5:12-CV-94-DPJ-FKB, 2012 WL 5185726, at *2 (S.D. Miss. Oct. 18, 2012) (collecting cases); *see* Defs.' Mem. [76] at 22.  McKinney's response to this argument is brief and relies on a Fourth Circuit case, which is not persuasive.  Pl.'s Mem. [83] at 30–31.  This claim is also arguably duplicative of the § 1981 retaliation claim that is not dismissed.  Summary judgment on this claim is granted.

***First Amendment***.  To prevail on a First Amendment retaliation claim, McKinney must prove: "(1) that [she] suffered an adverse employment action; (2) that [she] spoke as a citizen on a matter of public concern; (3) that the plaintiff's interest in the speech outweighed the government's interest in the efficient provision of public services; and (4) that the speech precipitated the adverse employment action." *Elizondo v. Parks,* 431 F. App'x 299, 302–03 (5th Cir. 2011) (citing *Modica v. Taylor*, 465 F.3d 174, 179–80 (5th Cir. 2006)).

When evaluating whether a plaintiff spoke as a citizen, the Court makes "a determination of whether the plaintiff spoke pursuant to his or her official duties." *Id.* at 303 (citing *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006)). "Several non-dispositive factors aid in an analysis of the speaker's role, including the internal versus external nature of the speech and whether the subject matter concerned the speaker's employment." *Id.*

Defendants believe McKinney "did not speak as a citizen about matters of public concern, rather she only voiced personal concerns internally to her immediate supervisor." Defs.' Mem. [76] at 17. Courts routinely hold that "complaints made up the chain of command about conditions in a workplace are often held be found unprotected." *Johnson v. Halstead*, 916 F.3d 410, 423 (5th Cir. 2019) (collecting cases); *see also Necaise v. May*, 700 F. Supp. 3d 469, 482 (S.D. Miss. 2023) ("Speech related to an employee's job duties that is directed within the employee's chain of command is not protected.") (collecting cases).

McKinney insists, however, that "[e]mployees in some cases *may* receive First Amendment protection for expressions made at work." Pl.'s Mem. [83] at 30 (emphasis added) (quoting *Garcetti*, 547 U.S. at 420). But she fails to direct the Court to cases addressing similar employment-related speech made to a direct supervisor. *See Garcetti*, 547 U.S. at 420 (noting some employees may receive First Amendment protection but concluding that Garcetti did not speak as a citizen and did not qualify for First Amendment protection).

McKinney's complaints about Elsmore's conduct on the job—made to her immediate supervisor during a meeting the supervisor called to address workplace disputes—were not matters of public concern. *See Rodriguez v. City of Corpus Christi*, 687 F. App'x 386, 390 (5th Cir. 2017) ("Rodriguez's raising of concerns about an incident that she witnessed at work with her employer's human resources department, rather than to the public, represents a chain-of-

21

command complaint that is ordinarily within the scope of every public employee's duty."). Summary judgment on this claim is also granted.

IV.    Qualified Immunity

McKinney sued Cook and Elsmore in their individual capacities, and both Defendants assert qualified-immunity defenses. Qualified immunity shields government officials performing discretionary functions from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Flores v. City of Palacios*, 381 F.3d 391, 394 (5th Cir. 2004) (quotation marks omitted). "A plaintiff seeking to defeat qualified immunity must show that (1) the official violated a statutory or constitutional right and (2) the right was clearly established at the time of the conduct." *Parker v. Blackwell*, 23 F.4th 517, 522 (5th Cir. 2022) (citing *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (en banc)).

***Statutory and constitutional violations.*** As noted, there is a jury question whether Cook's decision to terminate McKinney's employment was discriminatory or retaliatory under Title VII, § 1981, and § 1983. As for Elsmore, McKinney alleges that she exhibited racial animus towards her, she confronted Elsmore, and Elsmore influenced Cook to terminate her employment.

While Defendants have pointed to contrary evidence, there is circumstantial proof from which a jury could find that Elsmore went after McKinney during the July 2022 meeting to persuade Cook to terminate McKinney's employment. Recording [74] at 2:00–16:00. And that was not the first time. Cook testified that Elsmore spoke to him about these same complaints "once a week or so" before the July 2022 meeting. Cook Dep. [75-7] at 39. Why go to those lengths over a coworker she no longer worked beside? Whatever Elsmore said during those

exchanges, her position was clearly on Cook's mind when the July 2022 meeting started. Recording [74] at 1:38–59 (complaining about how badly McKinney treated Elsmore without having discussed the claim with McKinney). And he had already concluded that McKinney was "unreliable." Cook Dep. [75-7] at 72. He didn't even want to hear her side of the story. *Id.*

That's not to say Elsmore's take on the evidence is wrong. But again, the Court must view the evidence in the light most favorable to McKinney. And in that light, McKinney has shown a genuine dispute of material fact on whether Cook and Elsmore violated her rights.

***Clearly established law.*** Defendants correctly note that the "clearly established law" "must be particularized to the facts of the case." Defs.' Mem. [76] at 16 (quoting *Roque v. Harvel*, 993 F.3d 325, 335 (5th Cir. 2021) (cleaned up)). But "the right to be free from retaliation for exercising rights protected by § 1981 was clearly established by the Civil Rights Act of 1991." *Foley v. Univ. of Hou. Sys.*, 355 F.3d 333, 338–39 (5th Cir. 2003). So too, the "constitutional prohibitions against race and ethnic discrimination are so clearly established that a reasonable person would be aware of these rights." *Martinez v. Val Verde Cnty. Hosp.*, 46 F.3d 66, 1995 WL 29271, at *2 (5th Cir. 1995) (quotation marks omitted). Viewing the facts in the light most favorable to McKinney, Defendants' summary-judgment motion seeking qualified immunity is denied; Defendants may raise this defense at trial.

V.      *Ex Parte Young*

McKinney sued Ginger Tedder, MSMS's current-interim executive director, in her official capacity. *See* Am. Compl. [12] at 2. In their motion for summary judgment, Defendants say McKinney's claims for monetary relief are barred by sovereign immunity. Defs.' Mem. [76] at 12. And they argue her claim for reinstatement under *Ex Parte Young* should be dismissed. *Id.* at 14–15. In response, McKinney insists that "[f]our forms of *Ex Parte Young* relief are

sought in the complaint:  a) declaratory judgment; b) nominal damages; c) reinstatement; and d) attorney fees."  Pl.'s Mem. [83] at 25.  Then, because "Defendants' brief only addresses reinstatement," McKinney limits her argument to that issue.  *Id.* at 26.

Starting there, the Court finds questions of fact. The parties dispute whether there are available positions and whether McKinney would wish to return.  *See, e.g.*, Defs.' Reply [90] at 5.  But reinstatement is an equitable remedy the Court will decide if McKinney prevails.  *See McMillian v. Aberdeen Sch. Dist.*, No. 24-60419, 2025 WL 2529928, at *2 (5th Cir. July 23, 2025) (noting that reinstatement is equitable).  Determining whether the position is open is therefore premature and should be determined at the time McKenney prevails at trial, if she does. Moreover, future reinstatement is an option that the Court would consider.  *Id.* at *3–4 (reversing judgment because district court ignored future reinstatement) (citing *Garza v. Brownsville Indep. Sch. Dist.*, 700 F.2d 253, 254 (5th Cir. 1983)).

As to declaratory judgment, nominal damages, and attorney fees, the briefing is incomplete; these issues were explored for the first time in Defendants' reply and will not be considered now.  *See Gillaspy*, 278 F. App'x at 315.  That said, if McKinney prevails, the issues can be briefed before the Court addresses the equitable remedies.

VI.    Punitive Damages under Title VII

McKinney admits that punitive damages are unavailable under Title VII.  Pl.'s Mem. [83] at 32.  Defendants' motion on this point is granted.  Defs.' Mem. [76] at 25–27.

VII.    Conclusion

The Court has considered all arguments raised by the parties; those not specifically addressed would not have changed the outcome.  For the reasons explained, Defendants' motion for summary judgment [75] is granted in part and denied in part.  Specifically,

24

Plaintiff's age-discrimination claim is dismissed (Count 7);

Defendants' summary-judgment motion is denied as to Plaintiff's race-discrimination claims (Counts 1, 2, and 5);

Defendants' summary-judgment motion is granted as to Plaintiff's Title VII retaliation claim (Count 6);

Defendants' summary-judgment motion is denied as to Plaintiff's § 1981 retaliation claim (Count 4);

Defendants' summary-judgment motion is granted as to Plaintiffs' First and Fourteenth Amendment retaliation claims (Count 3);

Defendants' summary-judgment motion is denied to the extent they assert qualified immunity;

the Court reserves ruling on issues related to *Ex Parte Young*; and

Plaintiff's claim for punitive damages under Title VII is dismissed.

**SO ORDERED AND ADJUDGED** this the 13th day of April, 2026.

s/ *Daniel P. Jordan III*
UNITED STATES DISTRICT JUDGE

25